# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERNEST WOODALL,                     )
                                    )       Civil Action No. 11 – 607
                  Petitioner,       )
                                    )       District Judge David S. Cercone
v.                                  )       Chief Magistrate Judge Lisa Pupo Lenihan
                                    )
SUPT. JEROME W. WALSH; and the      )
ATTORNEY GENERAL FOR THE            )
STATE OF PENNSYLVANIA,              )
                                    )
                  Respondents.      )


## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

For the reasons stated herein, it is respectfully recommended that the Petition for Writ of

Habeas Corpus (ECF No. 1) be denied and that a certificate of appealability also be denied.

## II.   REPORT

Petitioner, Ernest Woodall (hereinafter referred to as "Woodall" or "Petitioner"), a state

prisoner currently incarcerated at the State Correctional Institution in Dallas, Pennsylvania has

petitioned the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition").

For the reasons that follow, the Petition should be denied.  Even affording Petitioner all *pro se*

consideration (including the time taken to unravel/decipher on Petitioner's behalf potential

factual and/or legal bases for constitutional rights within his varyingly vague and disjointed

filings), each of his claims is meritless for reasons readily and thoroughly apparent in the documents of record before this Court.

## A.    Relevant Factual and Procedural History

The facts of the crimes as set forth by the State Court[1] are as follows:

On May 5, 1996, two Pittsburgh Police Officers (Officers Dent and Morton) on routine patrol in a marked vehicle observed a vehicle obstructing a street, with the engine running and door ajar. They inquired of two people on the sidewalk across from the vehicle and Petitioner responded that the car was his. When asked to remove it from the middle of the street, Petitioner responded with an expletive directed at the officers and ran toward the back of the police vehicle.[2] Officer Morton exited the police vehicle and observed an assault rifle and automatic pistol in view on the front seat of Petitioner's car. Both officers converged on Petitioner at the rear of the police vehicle and Petitioner pulled a .45 caliber automatic Glock firearm with a laser site enhancement (hereafter the "Glock") from his waistband. Officer Morton pushed Petitioner and the Glock fell to the ground.[3] Petitioner ran off and the Officers initially gave chase but then

---

[1] A federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e).

[2] Officer Dent knew Petitioner from his patrol neighborhood and from towing the vehicle a week earlier. See October 20, 2010 Superior Court's Memorandum Opinion on PCRA Petition ("Superior Court Opinion on PCRA Petition") at 1.

[3] See Commonwealth's Answer to Petition for Writ of Habeas Corpus ("Officer Dent and Officer Morton exited the police wagon and met petitioner at the rear of the wagon. At that point, petitioner reached into his waistband and attempted to draw a weapon. Officer Morton struck petitioner in the chest and knocked him to the ground. When Officer Morton struck petitioner, the weapon fell on the ground.") (citing Trial Transcript at 42-44).

returned to the scene to secure an SKS assault rifle and Smith & Wesson .9mm automatic handgun from Petitioner's car and the Glock from the ground. All firearms were fully loaded. [4]

Petitioner returned to the scene carrying a semi-automatic rifle and wearing a newly-donned jacket. Petitioner yelled at the Officers, employing another expletive, that he wanted his property returned, and fired at them with the assault rifle from the cover of a trash dumpster. Officer Dent rushed Petitioner, who ran away while still firing in the Officers' direction. Officer Dent believed he hit Petitioner with a shot, but when Petitioner did not drop, Officer Dent concluded he was wearing a bullet proof vest. Four backup Pittsburgh Police Officers arrived. A civilian vehicle drove past and Officer Dent recognized Petitioner slouched down in a passenger seat; Petitioner made eye contact and exited the car and fired in the direction of the two marked backup police vehicles, with four officers inside, *with an AK-47 assault rifle*. Officer Dent fired back at Petitioner, providing cover for the other officers to exit their vehicles. Petitioner continued fire as he ran towards a woodline and disappeared. He could not be located thereafter despite searches; nor could he be located by the Federal Bureau of Investigation (the "FBI") for some time. See July 15, 2005 Opinion of the Allegheny County Court of Common Pleas in response to Petitioner's Statement of Matters Complained of on Appeal (hereafter "July 15, 2005 Trial Court Opinion"), Ex. 1-2. See also Commonwealth's Answer to Petition for Writ of Habeas Corpus (hereafter "Commonwealth's Answer").

In January, 2003, the FBI became aware of a possible fingerprint cross-match between Petitioner and an individual arrested under another alias in Birmingham, Alabama the previous November. On February 4, 2003 (*i.e.*, almost *seven (7) years later*), Plaintiff was arrested by

---

[4] See id. ("All three weapons were loaded with fully jacketed armor piercing rounds.") (citing Trial Transcript at 62); id. at 35-36 (citing T.T. at 48-55).

Federal Agents in Alabama and extradition inquiries were initiated. In March, 2003, Petitioner's local Alabama charges were resolved in a three-year prison sentence and in June he was transferred to a permanent Alabama Correctional Institution, from whence IAD ("Interstate Agreement on Detainers") procedures could be commenced. He was lodged in the Allegheny County Jail on August 2, 2003 and was scheduled for trial September 30th.

On September 30, 2003, Petitioner, represented by Pat Sweeney, Esquire, an Assistant Public Defender, appeared for the preliminary hearing Petitioner requested, and filed a Motion to Dismiss. A second hearing was held on October 27, 2003. Petitioner filed another Motion to Dismiss and one for Additional Discovery in late November, 2003. The next day, Petitioner appeared for a pre-trial motions hearing and requested new counsel. The trial court conferred with counsel and appointed John Elash, Esquire, to represent him, and granted a defense motion for postponement to May 19, 2004. Petitioner filed another Motion to Dismiss on February 6, 2004. On April 30, 2004, Petitioner's second counsel appeared before the Court and argued the Motion to Dismiss, requested a continuance and indicated he might need to postpone the trial date. On May 14, days before scheduled trial, Petitioner again changed counsel – from Atty. Elash to Atty. Sharif - and trial was accordingly continued. On July 9, 2004, Petitioner, represented now by his third counsel, Ernest Sharif, Esquire, appeared before the court for argument on Petitioner's pending motion. The motion was continued and the trial, by agreement of counsel, was set for November 8, 2004. Petitioner's counsel agreed that he had no problem with the time for trial. On July 9, 2004, Petitioner also filed a *pro se* pleading entitled "Habeas Corpus Dismissal Due to Fundamental Defect" arguing the merits of

his IAD issue.[5]   The Motion to Dismiss was subsequently denied on July 13, 2004.   On

November 4, 2004 Petitioner's then-counsel filed a Motion to Dismiss Pursuant to Pa. R. Crim.

P. 600.  On November 8, 2004, Petitioner, represented by his counsel, appeared for trial.  The

court denied Petitioner's Motion to Dismiss and the jury trial commenced.   <u>See</u>

Commonwealth's Answer; June 19, 2006 Superior Court Opinion on Direct Appeal at 4-10.

On November 12, 2004, Petitioner was convicted by jury of four (4) counts of Criminal

Attempt Homicide, 18 Pa. C.S. Section 901(a); six (6) counts Aggravated Assault, 18 Pa.C.S.

Section 2702(a)(1); one (1) count Violation of the Uniform Firearms Act – Firearms not to be

carried without a license, 18 Pa.C.S. Section 6106.  And on February 1, 2005 *he was sentenced*

*to* four (4) consecutive sentences of eight (8) to twenty (20) years incarceration *on each of the*

*four counts of criminal attempted homicide*.  Petitioner was *not* sentenced on the aggravated

assault or Uniform Firearms Act violations. <u>See</u> July 15, 2005 Trial Court Opinion at 1.  No post-

trial motions were filed.

In February, 2005, Petitioner, represented by counsel, properly filed a Statement of

Matters Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure

1925(b) and raised the following claims during his direct appeal:

> Did the trial court err by failing to dismiss the indictment under the Interstate
> Agreement on Detainers (IAD), 42 Pa.C.S.A. § 9101, Art. III and IV?

> Did the trial court violate Pennsylvania Rule of Evidence 404(a), 42
> Pa.C.S.A., in allowing a detective for the Federal Bureau of Investigation (FBI) to
> testify regarding the circumstances under which Appellant was apprehended and
> returned to Pennsylvania pursuant to the IAD?

> Did the trial court violate Appellant's right of confrontation under the Sixth
> Amendment to the U.S. Constitution in admitting into evidence weapons similar

---

[5] <u>See</u> discussion *infra*.

to those confiscated during the incident when the Commonwealth had destroyed the actual weapons prior to trial?

Did the trial court abuse its discretion in allowing testimony and argument that the Appellant had been wearing a bulletproof vest during the commission of the crime?

As noted above, the trial court filed its Opinion on July 15, 2005; it found the claims to be without merit. See Ex. 1-2. Petitioner filed an appellate brief with the Pennsylvania Superior Court, which affirmed the judgment of sentence on June 19, 2006. See Ex. 1-3 ("June 19, 2006 Superior Court Opinion on Direct Appeal").

On July 13, 2006, Petitioner filed an Application for Reargument/Reconsideration and on September 1, 2006, the Superior Court issued a Per Curiam Order denying the Application. On October 3, 2006, Petitioner filed a timely Petition for Allowance of Appeal with the Supreme Court of Pennsylvania, presenting the following claims:

Did the Superior Court err in ruling petitioner's counsel waived his right to a speedy trial in accordance with the Interstate Agreement on Detainers (IAD) Article III (a), IV(c) and VI (a)?

Did the Superior Court err when it ruled the Commonwealth's introduction of prejudicial unrelated criminal activity was harmless err [sic]?

Did the Superior Court err in ruling that petitioner was not unduly prejudiced by the Commonwealth's failure to produce the actual weapons alleged to be involved and allowing the Commonwealth to produce weapons that were similar in make and model?

Did the Superior Court err in finding that the trial court did not abuse its discretion in permitting the speculative opinion testimony that petitioner was wearing a bulletproof vest when he was never seen wearing a bulletproof vest?

By order dated May 10, 2007, the Supreme Court denied that petition. The petitioner did not file a Petition for Writ of Certiorari with the Supreme Court of the United States.

On December 19, 2007, Petitioner filed a timely *pro se* Petition for Post Conviction Relief pursuant to the Pennsylvania Post Conviction Relief Act (the "PCRA"), 42 Pa. Const. Stat. § 9541, *et seq*. Christopher Eyster, Esquire, was appointed to represent Petitioner and, on May 9, 2008, filed an amended petition. After requesting and receiving leave to file an amendment, Petitioner filed a Second Amended PCRA petition on December 23, 2008, raising the following claims:

> Petitioner did not waive his right to a speedy trial under the Interstate Detainer Act through his attorney's agreeing to a trial date.

> Trial counsel was ineffective for failing to object to other crimes evidence. Additionally, trial counsel was ineffective for failing to request a cautionary jury instruction on this other crimes evidence.

> Appellate counsel was ineffective for failing to raise the issue of trial counsel ineffectiveness on direct appeal.

> The Commonwealth destroyed evidence in violation of standard policy, and appellate counsel was ineffective for failing to argue 72 P.S. §3101.9 was inapplicable to the instant case.

> The Commonwealth committed prosecutorial misconduct, depriving petitioner of a fair trial.

> Additionally, trial counsel was ineffective for failing to request a jury instruction allowing the jury to draw an adverse inference from the Commonwealth's destruction of evidence.

> The Commonwealth committed a *Brady* violation by failing to turn over the complete destruction order with attachments.

On May 4, 2009, post-conviction relief was denied. Counsel filed a timely Notice of Appeal to the Superior Court and, in the July 6, 2009 Concise Statement of Matters Complained of on Appeal, presented a general claim of failure to hold an evidentiary hearing, incorporating by

reference "every issue and allegation of error raised in [the] *pro se* PCRA petition" and in the amended petitions of May 9, 2008 and December 23, 2008. The PCRA Court filed its opinion on September 11, 2009, deriving the issues from petitioner's second amended PCRA petition, and finding them without merit. <u>See</u> "September 11, 2009 Opinion on Second Amended PCRA Petition", Ex. 1-4.[6] Mr. Eyster submitted his Superior Court brief on February 12, 2010, raising six questions, framed as a general challenge to the PCRA court's dismissal of the petition without a hearing, with five subsidiary questions, *i.e.*, (1) that Petitioner's rights under the IAD were violated, (2) ineffectiveness of appellate counsel for not raising the "alleged prospective" waiver of his speedy trial rights, (3) ineffectiveness of trial counsel for not requesting an instruction on "other crimes" evidence, (4) ineffectiveness of trial counsel for failing to request an adverse inference instruction as to the destruction of evidence, and (5) prosecutorial misconduct in the form of a <u>Brady</u> violation. <u>See</u> "Superior Court Opinion on PCRA Petition", Ex. 1-5.

The Superior Court issued its Memorandum Opinion on October 20, 2010. Although the Superior Court expressly found all of Petitioner's issues except the "general claim of failure to hold an evidentiary hearing" were waived owing to vagueness and counsel's failure to specify the issues appealed and file a proper statement in compliance with PaR.A.P. 1925(b),[7] all of Petitioner's claims were nonetheless addressed on the merits

---

[6] <u>See id.</u> at 3 (observing that Petitioner's claims were "inartfully and improperly pled, non-specific, underdeveloped, unsubstantiated and ultimately without merit").

[7] <u>See id</u>. at 4 (noting that "[w]here the trial court orders an Appellant to file a concise statement of matters complained of on appeal under Pa.R.A.P. 1925, any issue not contained in that statement is waived on appeal") (quoting <u>Commonwealth v. Rolan</u>, 964 A.2d 398, 409 (Pa. Super. 2008)).

"in an abundance of caution".  Id. at 4.  The Superior Court properly held that Petitioner was

not entitled to an evidentiary hearing on his PCRA Petition,[8] and affirmed the PCRA Court's

denial of post- conviction relief.  Petitioner did not file a Petition for Allowance of Appeal

with the Supreme Court of Pennsylvania.

On May 10, 2011 Petitioner filed his Petition for a Writ of Habeas Corpus with this Court

pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)[9]  Petitioner's *pro se* Petition raised the following

claims:

1. Petitioner's Interstate Agreement on Detainer rights were violated because the purported waiver as to Plaintiff's trial date was (a) not "knowing, intelligent, voluntary", not "the product of an informed choice", and (c) an impermissible prospective waiver.

2. Petitioner's Fourteenth Amendment right to confrontation was violated because the prosecution was permitted to "replicate their alleged evidence" (*i.e.*, to use demonstrative evidence as to the Glock) and disregarded Petitioner's discovery requests made prior to destruction of the Glock.

3. A Brady violation and prosecutorial misconduct occurred because "the Prosecution . . . alleged evidence had been collected at the crime scene", *i.e.* various firearms and casings) and failed to provide a copy of the Destruction Order pertaining to this evidence until post-trial and Petitioner ultimately obtained a document that did not specifically identify each item of evidence as being destroyed.  Petitioner concludes it was concealed because it was exculpatory.

4. Trial counsel was ineffective for failing to request a jury instruction that the Commonwealth's destruction of the firearms evidence could raise an adverse inference.

---

[8] See id. at 5-6 (citing multiple cases, including Commonwealth v. Springer, 961 A.2d 1262 (Pa. Super. 2008)).

[9] The Court observes that the Petition was timely filed, for reasons correctly explicated in the Commonwealth's Answer.

5. Trial counsel was ineffective "for failing to request a jury instruction regarding other crime evidence" (*i.e.*, evidence of other crimes).

6. Petitioner claims "actual innocence and/or miscarriage of justice".

(ECF No. 1 at pp. 2-17). Respondents filed an Answer to the Petition on May 27, 2011 (ECF No. 8), and Petitioner filed a Brief in Support of Petition on June 15, 2011 (ECF No. 11) and a "Traverse Reply/Mandamus" responding to the Commonwealth's Answer, on *July 5, 2011* (ECF No. 13), as well as a July 26, 2011 Formal Jurisdictional Challenge Under the Due Process Clause (ECF No. 14). On September 12, 2011, Petitioner also moved for a hearing and for appointment of counsel (ECF No. 15), which motion was denied, as was Petitioner's January 9, 2012 Motion for Reconsideration (ECF No. 17).

On June 20, 2012 (less than a year after his substantive responsive pleading on the Petition), Petitioner sent a letter to the Court which was docketed as a Motion for Status Report, and the next day this Court entered a text Order advising that "the court acknowledges plaintiff's frustration and sympathizes with his situation. However, the court has numerous petitions for habeas corpus . . . . Petitioners case will be reviewed and a decision rendered in the order it was received." On September 27, 2012, Petitioner filed a petition for a writ of mandamus with the Third circuit. No notice of this was sent to the undersigned. A Mandamus Order was executed by the Court of Appeals for the Third Circuit on June 10, 2013 directing this Court to issue an Order on Petitioner's Petition within sixty (60) days. The Mandamus Order was not, however, communicated to this District Court and Chief Magistrate Judge until an email from a Circuit official on June 25, 2013. The Court has now given Petitioner's claims, *with priority*, the full consideration it has afforded each individual appearing before it and requesting review of

underlying criminal proceedings and State Court appeals - and the accompanying extensive records - in the context of a Petition for Writ of Habeas Corpus. While this Report and Recommendation, and the consideration of Petitioner's claims, has been timely completed under the date of the June 10, 2013 Mandamus Order, the time requirements for objection will extend entry of the final Order on the Petition slightly beyond the time initially prescribed, *i.e.*, sixty (60) days from date of execution, but within sixty (60) days of the date of communication.

**B.     General Standards Governing Federal Habeas Corpus Review**

**1.     Exhaustion Requirement**

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state habeas proceedings, mandamus proceedings, or other available procedures for judicial review. See, *e.g.*, Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996). A petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion will be considered satisfied. O'Sullivan v. Boerckel, 526 U.S. 838 (1999). Petitioner has the burden of establishing that exhaustion has been satisfied. Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state prisoner's claims prior to exhaustion when no appropriate state remedy exists.

Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997); Doctor, 96 F.3d at 681; Carter v. Vaughn, 62 F.3d 591, 594 (3d Cir. 1995). A petitioner shall not be deemed to have exhausted state remedies, however, if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c). An application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2).

### 2. **Procedural Default Doctrine**

Even where a claim has been properly exhausted, a federal court may nonetheless be precluded from reviewing claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d 666, 678 (3d Cir. 1996). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system and, in turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman, 501 U.S. at 750.

A state's procedural rules are entitled to deference by federal courts; a petitioner's violation of a state procedural rule may constitute an independent and adequate state law ground for denial of federal review of habeas claims under the procedural default doctrine. Id.; Sistrunk, 96 F.3d at 673. Moreover, violations of a state's procedural rules may constitute an independent and adequate state ground sufficient to invoke the procedural default doctrine even where no state court explicitly has concluded that a petitioner is procedurally barred from raising his

claims. Glass v. Vaughn, 65 F.3d 13, 15 (3d Cir. 1995), *cert. denied*, 516 U.S. 1151 (1996); Carter, 62 F.3d at 595. However, the procedural default doctrine only applies when a state procedural rule is consistently or regularly applied. Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997) (quoting Johnson v. Mississippi, 486 U.S. 578, 588-89 (1988)). A petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: 1) "cause" for the default *and* "actual prejudice" as a result of the alleged violation of federal law; or 2) failure to consider the claims will result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750; Carter, 62 F.3d at 595.

To satisfy the cause standard, a petitioner must demonstrate that some objective factor external to the defense impeded his or her efforts to raise the claim in state court. McCleskey v. Zant, 499 U.S. 467, 493 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice." Carrier, 477 U.S. at 494. Where a petitioner cannot make a showing of "cause and prejudice," a federal court may nevertheless consider the merits of his or her unexhausted claims under circumstances in which the failure to adjudicate such claims would result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750. This exception to the procedural default doctrine is based on the principle that, in certain circumstances, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" Carrier, 477 U.S. at 495 (quoting Engle v. Isaac, 456 U.S. 107, 135 (1982)).

The "prototypical example" of a miscarriage of justice is a situation in which an underlying constitutional violation has led to the conviction of an innocent defendant. Sawyer v. Whitley, 505 U.S. 333, 340 (1992). In that instance, the merits of a petitioner's claims can be considered notwithstanding his or her failure to raise them before the state courts. In order to avail himself or herself of this exception to the procedural default rule, a petitioner must make a substantial showing that he or she is actually innocent of the crime for which he or she is incarcerated. Schlup v. Delo, 513 U.S. 298, 324 (1995). "To be credible, such a claim requires [the] petitioner to support his [or her] allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Id. If this requirement is satisfied, the federal court must consider "whether it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." Hubbard v. Pinchak, 378 F.3d 333, 340 (3d Cir. 2004). This standard "does not merely require a showing that a reasonable doubt [as to the petitioner's guilt] exists in the light of the new evidence, but rather that no reasonable juror would have found the [petitioner] guilty." Schlup, 513 U.S. at 329. "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." House v. Bell, 547 U.S. 518, 538 (2006).

While the petitioner's innocence need not be determined with "absolute certainty" at this "gateway stage," his or her burden is to demonstrate that, in light of the new evidence, it is more likely than not that *any* reasonable juror would have reasonable doubt as to his or her guilt. Id. In the habeas corpus context, a federal court sits to ensure that an individual is not imprisoned in

violation of the Constitution and laws of the United States, "not to correct errors of fact." Herrera v. Collins, 506 U.S. 390, 400 (1993). Consequently, a finding of "actual innocence" is not an independent ground for habeas corpus relief, but rather a "gateway" through which a petitioner can pass to have a federal court consider underlying claims that would otherwise be subject to procedural default. Id. at 404. In the absence of new evidence of the petitioner's innocence, the existence of an underlying constitutional violation provides a federal court with no basis for adjudicating a procedurally defaulted claim. Goldblum v. Klem, 510 F.3d 204, 225-226 (3d Cir. 2007). Only after the presentation of new evidence may a federal court proceed to consider whether, in light of *all* relevant evidence, it is more likely than not that no reasonable juror would vote to convict the petitioner of the crime for which he or she is incarcerated. House, 547 U.S. at 537-39; Goldblum, 510 F.3d at 225-26.

Finally, the United States Court of Appeals for the Third Circuit has instructed that a petition containing exhausted and unexhausted but procedurally barred claims is not a mixed petition requiring dismissal under Rose v. Lundy, 455 U.S. 509 (1982). *See* Wenger v. Frank, 266 F.3d 218, 227 (3d Cir. 2001). Instead, the Court of Appeals held that the district court should review the merits of the exhausted claims but must not decide the merits of the claims that are barred under the procedural default doctrine. Id.

### 3. <u>Standard of Review for Exhausted (and not Procedurally Defaulted) Claims</u>

In describing the role of federal habeas proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence . . . . The role of federal habeas proceedings, while

important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 100 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). "Clearly established Federal

law" is determined as of the date of the relevant state-court decision.  <u>Greene v. Fisher</u>, 606 F.3d 85, 95 (3d Cir. 2010), *aff'd*, <u>Greene v. Fisher</u>, 132 S. Ct. 38 (2011).  And few state court decisions are "contrary to" such law.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent.  "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'"  <u>Id</u>. (quoting <u>Williams</u>, 529 U.S. at 407).  The focus is on whether the law has been applied in an "objectively unreasonable" – rather than incorrect - manner.  <u>Bell</u>, *supra*; <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007).

The Supreme Court has illustrated the deference that the federal courts must accord to state court decisions.  In <u>Renico v. Lett</u>, 130 S. Ct. 1855 (2010), the Supreme Court observed that:

> It is important at the outset to define the question before us.  That question is not whether the trial judge should have declared a mistrial.  It is not whether it was an abuse of discretion for her to have done so -- the applicable standard on direct review.  The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law."  § 2254(d)(1).

<u>Lett</u>, 130 S. Ct. at 1862.  The Supreme Court further instructed:

> It is not necessary for us to decide whether the Michigan Supreme Court's decision -- or, for that matter, the trial judge's declaration of a mistrial -- was right

or wrong. The latter question, in particular, is a close one. . . . . [F]or the reasons we have explained -- *whether the trial judge was right or wrong is not the pertinent question under AEDPA.*

Id. at 1865, n.3 (emphasis added). See also Harris v. Ricci, 607 F.3d 92 (3d Cir. 2010).

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. Id. (citing Marshall v. Longberger, 459 U.S. 422, 433 (1982)). Where the state court fails to adjudicate or address the merits of a petitioner's claims, unless procedurally defaulted, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

As to evidentiary rulings made by the trial court, it is well settled that such decisions are vested in the trial court's sound discretion. An evidentiary error is deemed harmless on appeal where the appellate court believes beyond a reasonable doubt that the error could not have contributed to the verdict. See Commonwealth v. Story, 383 A.2d 155, 164-66 (1978) (delineating factors to be considered, including (a) whether error was prejudicial and, if so, whether it was *de minimis*; (2) whether erroneously admitted evidence was merely cumulative; and (3) whether evidence of guilt was so overwhelming that prejudicial effect of error was insignificant). See also Commonwealth v. DeJesus, 880 A.2d 608, 614 (2005).

Petitioner's claims will be reviewed in accordance with the standards set forth above.

### C.    Petitioner's Claims

The Court observes, as a threshold matter, that as discussed in Section II.A., <u>Relevant Factual and Procedural History</u>, the Superior Court held Petitioner's claims, presented in his amended PCRA Petition, waived for failure to comply with State requirements as to the Statement of Claims and specificity of pleading (*i.e.*, it initially deemed all claims but Petitioner's general claim regarding denial of a PCRA hearing procedurally defaulted).    The Superior Court nonetheless addressed and denied each of Petitioner's claims on the merits.  <u>See</u> Superior Court's Opinion on PCRA Petition.  As the Superior Court's decision was not premised solely on State procedural grounds, and proceeded to address the merits, this Court has afforded Petitioner the same "benefit of the doubt" and reviewed his claims on the merits under the standards applicable to his Petition for Writ of Habeas Corpus.  <u>See</u>, *supra*, Section II.B. [10] The Court further observes that, as its explication of Petitioner's claims reflects, absent this consideration, Petitioner could not and *would not* – on his pleadings or the record - overcome the applicable procedural default bar via a showing of "cause and prejudice" or a "fundamental miscarriage of justice" (innocence and new evidence) as to his claims.  <u>See</u> discussion of applicable standards, *supra* at Section II.B.  Thus to Petitioner's claims:

---

[10]    <u>Cf.</u> <u>Kindler v. Horn</u>, 542 F.3d 70, 79 (2008) (stating that "[a] procedural rule that is consistently applied in the vast majority of cases is adequate to bar federal habeas review even if state courts are willing to occasionally overlook it and review the merits of a claim for relief where the rule would otherwise apply"); <u>Beard v. Kindler,</u> 130 S.Ct. 612 (2009) (confirming that "discretionary procedural rule" *can serve* as adequate ground to bar federal habeas review) (cited in Commonwealth's Answer at 43-33).

1. **Petitioner's Interstate Agreement on Detainer rights were violated by his trial date**

The IAD, 42 Pa.C.S. §9101 *et seq*., is an agreement between the states and establishes procedures for the transfer of prisoners incarcerated in one jurisdiction to the temporary custody of another jurisdiction which has lodged a detainer against a prisoner. When a "detainer" is lodged, the prisoner may then request expeditious resolution of the outstanding charges. IAD Art. III (a) provides in relevant part:

> (a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state an untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint.

42 Pa.C.S.A. § 9101 Article III (a).[11]  Article III also provides that "*for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance*."  And the IAD may be tolled by the defendant's own actions.  Commonwealth v. Mayle, 780 A.2d 677, 682 (Pa. Super. 2001).

As noted above, Petitioner was located and arrested by federal authorities in Alabama in February, 2003, and was in permanent incarceration – from which a Request for Temporary Custody in Allegheny County could be processed – on June 9, 2003.  The Allegheny County

---

[11] As noted *supra*, if the prisoner does not request expeditious resolution or challenges extradition, the receiving jurisdiction has, under Art. IV, 120 days to bring him to trial upon gaining custody.

District Attorney's Office received the response to its request on June 27, 2003 and the Commonwealth asserts that, accordingly, trial was to occur on or before December 24, 2003.

Trial was originally scheduled for September 30, 2003. Petitioner, through counsel, filed a Motion for Preliminary Hearing on September 27, 2003, and a Motion to Dismiss on September 30, 2003. He filed another Motion to Dismiss on November 21, 2003 and a Motion for Additional Discovery on November 24, 2003. At a pre-trial motions hearing on November 25th, Petitioner requested that his counsel be dismissed and was appointed Atty. Elash, who on December 4, 2003, filed a Motion for Postponement of Trial due to his recent appointment; a new trial date was set for May 19, 2004. On February 6, 2004, Atty Elash filed a Motion to Dismiss (the third to be filed in Petitioner's case); in mid-May, 2004 – only days prior to trial – Atty. Sharif entered an appearance on Petitioner's behalf, Atty. Elash was permitted to withdraw, and trial was again rescheduled *owing to Petitioner's own filings and conduct.* At a July 9, 2004 hearing on the Motion to Dismiss on grounds of violation of the IAD time provisions, Petitioner requested – in response to the Court's proposal to set a date for the jury trial and avoid further delays – additional discovery from the Commonwealth for "whatever they got". Petitioner's counsel then advised, in response to the Court's proposal that the jury be picked November 8, 2004, "That is fine." The Court asked "You have no problem with the time issues?" and Petitioner's counsel, Atty. Sharif, replied "That is a good date" and the matter was adjourned, with the Motion to Dismiss being denied on July 13, 2004. Petitioner's counsel filed another Motion to Dismiss (the fourth) on November 5, 2004, alleging that a 120 day period under IAD Article IV (as opposed to 180 days under Article III) applied and had been violated. See

Commonwealth's Answer at 22-26. Argument on this Motion was heard, and it was denied, on November 8, 2004.[12]

As cogently addressed by the Superior Court in its June 19, 2006 Opinion on Petitioner's Direct Appeal, the trial court has the discretion to grant necessary or reasonable continuances and the IAD may be tolled by a defendant's own actions – as, in Petitioner's case, by "seeking various continuances to accommodate changes in counsel and filing numerous motions to dismiss". See June 19, 2006 Superior Court Opinion on Direct Appeal at 13, 15 (citing Commonwealth v. Montione, 720 A.2d 738 (Pa. 1998) (holding delays attributable to defendants are excluded for purposes of speedy trial provisions in IAD cases, and pretrial motions filed by defendants represent "implicit consent" to requisite time to resolve them). Moreover, a defendant "may waive his rights under the IAD by agreeing to a trial date outside the time periods mandated by the statute." Id. at 13 (quoting Commonwealth v. Jones, 886 A.2d 689, 696-97 (Pa. Super. 2005) (citing New York v. Hill, 528 U.S. 110 (2000))); id. at 14 (noting that in Jones, defendant's counsel "agreed on a trial date which fell outside of the" IAD period and thus "waived [his] subsequent . . . objection"). In this case, Petitioner's counsel, in Petitioner's presence, stated on the record that he accepted the November 8, 2004 trial date. See id. at 15.

---

[12] Cf. Commonwealth's Answer at 25 n. 11 (observing that Article IV of the IAD proscribes a 120 day trial date where a party state, rather than the prisoner, requests disposition of the untried indictment/complaint); id. (further observing that "same events that operate to extend the . . . date under Article III would operate likewise [under] Article IV"); id. at 25 (noting that Superior Court of Pennsylvania determined that Art. III applied because Petitioner requested disposition of the Pennsylvania charges) (citing App. at 158). See also July 15, 2005 Trial Court Opinion at 7 ("Pursuant to Article III of the IAD the Defendant signed the necessary forms."); id. (noting that the procedures of Article IV would lead to the same conclusion where delays were attributable to Petitioner's changes of attorney and motions); id. at 7 (noting that Commonwealth was ready to proceed on September 30, 2003 and all subsequent trial dates set and delayed by Petitioner's conduct).

Petitioner's present contentions that waiver by his counsel, as opposed to himself, was ineffective or somehow not "knowing, intelligent, [or] voluntary" are misguided and groundless. See Petitioner's Traverse Reply/Mandamus at 2. The very case law to which Petitioner cites expressly holds that "waiver may be effected by action of counsel" and is not required to be made by "the defendant personally" for decisions "pertaining to the conduct of the trial", including "scheduling matters [which] are plainly among the decisions for which agreement by counsel generally controls." Id. at 3 (further quoting the Hill Court's observation that a "trial court was not required to conduct a colloquy to ensure that petitioner made a knowing, intelligent and voluntary waiver of his rights under the IAD, and that waiver was the product of an informed choice; rather the . . . court properly deferred to counsel") (quoting New York v. Hill, 528 U.S. 110 (2000); citing Williams v. Taylor, 529 U.S. at 405-06).

Similarly, his rambling assertion that counsel's trial date waiver was prospective (because a Motion was pending), and therefore void as akin to the blanket prospective waiver of rights in Zedner v. United States, 547 U.S. 489 (2006),[13] is without merit. See June 19, 2006 Superior Court Opinion on Direct Appeal at 16. To the contrary, Petitioner's third counsel in this case – after repeated delays attributable to Petitioner's last-minute changes in counsel and multiple motions - agreed to a specific trial date, on which Petitioner's trial did in fact commence, and prior to which all pending Motions filed by Petitioner's counsel were decided . See discussion of criminal case proceedings, supra. See also Superior Court Opinion on PCRA Petition at 8-9 (concluding that (a) "cursory and undeveloped claim of prospective waiver . . . fail[ed] to present and prove an issue of arguable merit by a preponderance of the evidence", and (b) Zedner is

---

[13] See Petitioner's Traverse Reply/Mandamus at 4-6.

"demonstrably distinguishable"); <u>Hill</u>, 528 U.S. at 115 (expressly turning not on a blanket prospective waiver of IAD rights, but solely on agreement to a specified delay in trial).

As stated above, this Court is required to review Petitioner's claims in accordance with the standard of review set forth in the AEDPA. Specifically, in order to be entitled to relief, Petitioner must show that the Pennsylvania Court's decision in this instance was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States (or that it was premised on an unreasonable determination of the facts in light of the evidence presented).[14] This is a "difficult to meet," and "highly deferential standard" as to which Petitioner carries the burden of proof. <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1398 (2011) (internal citations omitted).

A state court decision fails the "contrary to" prong of AEDPA if the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts. <u>McMullen v. Tennis</u>, 562 F.3d 231, 236 (3d Cir. 1990) (quotation and citations omitted). And a state court ruling is considered an "unreasonable application" if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context

_____

[14] Some Circuit Court of Appeals have restricted their review under the AEDPA to United States Supreme Court decisions alone. *See*, *e.g.*, <u>Herbert v. Billy</u>, 160 F.3d 1131, 1135 (6th Cir. 1998) (considering itself barred from examining "lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law"). The Court of Appeals for the Third Circuit, however, has concluded that decisions of federal courts below the level of the United States Supreme Court may be helpful in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as "helpful amplifications" of that precedent. <u>Moore v. Morton</u>, 255 F.3d 95, 105 (3d Cir. 2001) (quoting <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 890 (3d Cir.) (*en banc*), *cert. denied*, 528 U.S. 824 (1999)).

where it should apply.  <u>Harris v. Ricci</u>, 607 F.3d 92, 96 (3d Cir. 2010).  It is clear from the record that the State Court's ruling in this matter was neither contrary to nor an objectively unreasonable application of clearly established Federal law; nor was there any unreasonable determination of facts in light of the evidence presented.  Petitioner has not met his burden of showing entitlement to habeas corpus relief as to his first claim.

**2. Petitioner's Fourteenth Amendment right to confrontation was violated by the admission of demonstrative evidence and disregarded of Petitioner's discovery requests.**

Petitioner has asserted that his right of confrontation was violated when the Commonwealth was permitted, over Petitioner's objection, to introduce as evidence weapons similar to the Glock (which Petitioner had attempt to remove from his waistband at the onset of his altercation with the police, but which dropped to the ground on contact and was retrieved by the police when Petitioner initially fled), and the .9 mm handgun and SKS assault rifle (which were observed on the front seat of Petitioner's unoccupied car and secured by the police).

This Court notes that none of these three (3) weapons were employed in the attempted homicides of which Petitioner was convicted and on which he was solely sentenced (the attempted homicides having been committed with the AK-47 assault rifle with which Petitioner returned to the scene, demanding that the officers surrender his vehicle and other firearms).

As the Superior Court observed, the officer testified at trial that the weapons exhibited were each the same make and model as those taken into custody on May 5, 1996; the weapons were authenticated by the officer who took custody of and secured them on the day of the incident; he described any specific differences (*i.e.*, the regular vs. folded stock of the SKS); the jury was specifically advised the exhibits were demonstrative and not the actual weapons; and

the defense had full opportunity to, and did, cross-examine the witness testifying as to this evidence. Moreover, the jury "heard extensive testimony regarding what happened to the actual weapons", *i.e.*, that they were destroyed because of the length of time they had been retained/unused/unclaimed owing to Petitioner's evasion of arrest through inter-state flight and the use of aliases for seven (7) years. See June 19, 2006 Opinion on Petitioner's Direct Appeal at 26-30 (citing Pennsylvania cases, including Commonwealth v. Reid, 811 A.2d 530, 552 (Pa. 2002) (holding that "[a]s in the admission of any other evidence, a trial court may in its discretion admit demonstrative evidence . . . if its relevance outweighs any potential prejudice effect" and providing that demonstrative evidence is "properly authenticated" to show it is a "fair and accurate representation"));[15] Reid, 811 A.2d at 532 (concluding evidence of similar gun was not unduly prejudicial where "Commonwealth made clear [it] was not a depiction of the actual gun but rather a gun that merely resembled the actual gun *used in the shootings*"). Cf. June 19, 2006 Opinion on Petitioner's Direct Appeal at 31-32 n. 10 (explicating trial testimony regarding destruction of evidence held for lengthy periods of time to reduce inventory in limited evidence storage space, under "standard destruction of evidence" orders for intermittent large-quantity destruction such as June 24, 2004 Order covering "433 handguns and 183 long arms confiscated" during 1996, under which the three firearms at issue in Petitioner's claims were "melted").[16]

---

[15] See also July 15, 2005 Trial Court Opinion at 9 (noting that Officer Dent, who had firearms familiarity and custody of subject weapons at time of incident, testified as to demonstrative evidence).

[16] Cf. also Commonwealth's Answer at 31-35 (thorough delineating the trial evidence regarding routine periodic requests for the destruction of old evidence pursuant to state law). As noted in the Commonwealth's Answer (see id. at 36-38), the Superior Court also appropriately observed that Petitioner's assertion that he was prejudiced by a failure to preserve allegedly "potentially useful" evidence relates to a due process claim that "implicates the Youngblood standard", which

Petitioner's claim to habeas relief on grounds that the trial court erred in permitting introduction of demonstrative evidence of similar but unrelated weapons thus fails. Petitioner has failed to identify any basis for finding the State Court's determinations contrary to or an objectively unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. Cf. Commonwealth's Answer at 40-41 (citing multiple cases holding that there was no violation of confrontation clause and/or due process rights where authorities intentionally, but without bad faith, destroyed evidence and witnesses testified/were cross-examined).[17]

---

requires a showing that "the police acted in bad faith." See June 19, 2006 Opinion on Petitioner's Direct Appeal at 30 (quoting Arizona v. Youngblood, 488 U.S. 51 (1988)), id. (citing Commonwealth v. Scher, 803 A.2d 1204 (2002)); id. at 31-32 n. 10 (explicating circumstances of destruction).

[17] The Court also observes that, as discussed *supra*, these firearms were confiscated by the police from the vicinity of Petitioner's vehicle and were not employed in the attempted homicides on which he was convicted and sentenced. Thus, even if as Petitioner now sometimes appears to assert, he requested discovery encompassing these weapons while he was in Respondent's custody and before the Commonwealth's routine evidence destruction, and even if there had been omissions or inconsistencies in the associated record-keeping as to the Glock (see discussion, *infra*) – as to which assertions this Court concludes Petitioner has failed to meet each and every standard of habeas review applicable to the related State Court decisions – the State Court's evidentiary rulings as to these weapons were not only in its sound discretion but were properly deemed harmless on appeal where it was beyond a reasonable doubt that they could not have contributed to the verdict. Compare Petitioner's Traverse Reply/Mandamus at 8 (objecting to weapons evidence and asserting that where Destruction Order assertedly "revealed that all evidence was not destroyed per the request as asserted by respondent, thus, Petitioner's Right of confrontation required those items not recorded as being destroyed, be produced, BRADY, infra") with Petition for Writ at 8 (alleging, under "supporting facts" that "prosecution "was permitted to replicate their alleged evidence . . . while also, disregarding Petitioner's 'repeated Discovery Request'").

Although Petitioner's often murky filings are sometimes worded in a way alleging that he had requested discovery between his Federal arrest and the execution of the routine Destruction Order, see, e.g., Petitioner's Traverse Reply/Mandamus at 16 (referring to "two timely discovery request 'prior to respondent requesting and destroying the evidence'"), a close review of the

### 3. **A Brady violation and prosecutorial misconduct occurred because the prosecution failed to provide a copy of the Destruction Order and suppressed evidence.**

The Superior Court observed that three (3) trial witnesses testified at length as to the Allegheny County Court of Common Pleas and City of Pittsburgh Police Bureau procedures for managing limited inventory space through Court-approved Destruction of Evidence Orders for routine, large quantity (*i.e.*, hundreds of items) destruction of confiscated property which had been retained/unused/unclaimed for more than five (5), or in the case of homicide or sexual assault cases seven (7), years. See June 19, 2006 Opinion on Petitioner's Direct Appeal at 30-31, n. 10. Defense counsel "vigorously cross-examined each . . . witness[]" finding "nothing to even remotely suggest that the actual weapons were destroyed for any [other] reason." Id. at 31. Compare Petitioner's Traverse Reply/Mandamus at 7 (asserting that Commonwealth's position regarding unavailability of evidence owing to seven year evasion of arrest was "flawed, inaccurate, misleading and outright false where here, the FACT of the matter is the passage of time had nothing to do with the 'alleged destruction' of the evidence because it was known to Respondent that Petitioner was in custody on February 4, 2003 in Birmingham, Alabama, and the destruction allegedly occurred on August 14, 2004") (citiations omitted).

In his Second Amended PCRA Petition, Petitioner alleged that only two of the three firearms collected from the vicinity of his vehicle at the crime scene were identified in

---

record in the case indicates that Petitioner at other times appears to allege that (a) the weapons should not have been destroyed after the authorities were aware he had been taken into custody and (b) he requested discovery after the weapons' destruction pursuant to which a complete copy of the Destruction Order and supplemental lists should have been – but were not – produced. See discussions in text. In accordance with the analysis of this Opinion, neither scenario would establish entitlement to habeas relief.

supplemental documents related to the July 14, 2004 mass 5-7 year old inventory Destruction Order, and specifically that the Glock was not listed. He therefore concluded it was both (a) "newly discovered exculpatory evidence" within 42 Pa.C.S.A. Section 9543(a)(2); and (b) undisclosed evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). <u>See</u> September 11, 2009 Opinion on Second Amended PCRA Petition at 3-4.

But as the Trial Court observed, Petitioner failed to meet his burden to demonstrate, as Section 9543 requires, either that (1) the evidence on which this claim was based was "previously unavailable" given that such routine Destruction Orders and all lists of items destroyed are public records filed with the Clerk of Courts; or (2) introduction of the evidence would have changed the outcome of the trial. As noted *supra*, the Glock was dropped to the ground unfired and retrieved by the police early in the altercation; and the weapon with which Petitioner fired at the officers, escaped, and was subsequently convicted of four (4) counts of attempted homicide was an AK-47 assault rifle. Petitioner was not sentenced on anything other than the attempted homicide convictions. <u>See</u> September 11, 2009 Opinion on Second Amended PCRA Petition at 4 (citing Misc. Docket No. 812, July 2004 regarding the Destruction Order and accompanying list).

And as the Court's Opinion also observed, a claim under <u>Brady</u> requires a showing that the evidence was material to Petitioner's guilt or punishment, *i.e.*, that the "prosecution suppressed material exculpatory evidence . . . and that there is a reasonable probability that the result of the proceeding would have been different but for the alleged suppression of the evidence." <u>Id.</u> at 4-5 (quoting <u>Commonwealth v. Dennis</u>, 950 A.2d 945, 966 (Pa. 2008)). <u>See also</u> <u>Commonwealth v. Strong</u>, 761 A.2d 1167, 1171 (Pa. 2000) (observing that a <u>Brady</u> due

process violation arises where (a) evidence was withheld/suppressed that was potentially (b) helpful to defendant, and (c) there is "a reasonable probability that the result of the trial would have been different if the evidence had been produced").

The Superior Court then provided its own pointed and well-founded rejection of this claim, observing (a) the evidence of record supporting the trial court's findings that destruction of the evidence was done according to court order pursuant to standard policy related to limited storage space and in the ordinary course of business, and (b) Petitioner's leap *from* the asserted omission of the Glock from a one-page inventory list excerpt *to* claims that (i) it never existed (a claim not previously raised or preserved) and that (ii) the Destruction Order attachments were exculpatory and suppressed. See Superior Court's Opinion on PCRA Petition at 11-13. The Superior Court noted Defense counsel's cross-examination of the trial witnesses who testified that the ballistics expert examined the weapons, including the Glock, before they were sent for destruction, and all three (3) weapons confiscated the day of the incident (which did not include the AK-47 used in the attempted homicides) were destroyed, as substantiated by a notation on the crime laboratory receipt. It also noted the evidence that the inventory page introduced referred only to crime laboratory case receipt numbers, did not describe the weapons themselves, and did in fact, by laboratory case, encompass the Glock. See id at 13-14 (citing N.T. Trial at 48, 122, 142, 373-77, 382-83). See also Commonwealth's Answer at 33-35 (noting, with citations to T.T. at 372-374, 378-83, testimony of Officer in charge of property room that those confiscated in Petitioner's case were processed at Crime Lab No. 19962812 and melted at AK Steel in Butler, Pennsylvania); id. (further noting, with citations to transcript, that the pertinent Allegheny County Dept. of Laboratories Report listing items submitted to the Crime Lab that

were destroyed pursuant to the Destruction Order on August 14, 2004 included a .45 caliber Glock with a laser site and obliterated serial number, an SKS 7.62 by .39 caliber assault weapon, a Smith & Wesson 9 millimeter weapon, and a banana ammunition clip); id. (further noting, with citations to transcription, testimony of criminologist assigned to Petitioner's Crime Lab case number, that each of these weapons were submitted and tested/examined by her); id. at 50-53.

In sum, and for the reasons recounted above, Petitioner falls far short of meeting, as to this claim, the standards applicable to habeas review. Moreover, neither the existence or non-existence of the Glock at the time of trial, nor the use of authenticated demonstrative evidence in its stead (which was properly admitted), nor even its existence and confiscation at the time of the crime (which was not contested),[18] could entitle Petitioner to relief given the Glock's immateriality (as the State Courts also correctly noted) to the trial outcome. See, e.g., Superior Court's Opinion on PCRA Petition at 15 ("We further note the PCRA court's finding that since Appellant shot at the officers with the AK-47, documentary evidence of the subsequent destruction, vel non, of the .45 Glock is not material to Appellant's guilt of attempted murder or aggravated assault, or punishment . . . The PCRA court's finding is supported by the record.").[19]

---

[18] See Superior Court's Opinion on PCRA Petition at 14 (noting that such claim is "totally unsupported by the record", Glock's existence was never contested despite repeated references to it during trial, and assertion it did not exist was "essentially a challenge to the sufficiency of evidence" for the Uniform Firearms violation charge, which Petitioner waived by failure to raise on direct appeal").

[19] Cf. Petitioner's Traverse Reply/Mandamus at 14 ("Petitioner also amplifies how impeachment of the testimony regarding the (NEVER PRODUCED .45 Glock Pistol) was crucial where the .45 Pistol testimony was submitted for the sole purpose of inflaming the passion of the Juror(s) with the testimony that Petitioner had "INTENT" of doing harm to the Officer('s)"). The Court observes that any intent to do harm (prior to his actual firing upon the police officers) could be reasonably inferred from Petitioner's return to the scene re-armed with an AK-47 rifle, with which to persuade the officers to return his confiscated firearms. And, again, all State Court

**4. Trial counsel was ineffective for failing to request a jury instruction that the Commonwealth's destruction of the firearms evidence could raise an adverse inference.**

As the Trial Court discussed in its September 11, 2009 Opinion on Second Amended PCRA Petition at 3, n. 3, Petitioner's assertions that his counsel was ineffective (in several instances) all failed the applicable three-prong standard of Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987) (adopting Strickland) in that - even assuming (a) arguable merit - Petitioner demonstrated neither (b) that counsel's actions were "unreasonable in terms of adequate representation", nor (c) "how any ineffectiveness claimed actually prejudiced him in terms of" the trial outcome. See also Superior Court Opinion on PCRA Petition at 6 (explaining that the Pennsylvania Court "has refined the Strickland performance and prejudice test into a three-part inquiry" under which, "[t]o prove counsel ineffective, the petitioner must show that "(1) the underlying legal issue has arguable merit; 2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell petitioner from counsel's act or omission");[20] id. at 7, 10-11 (further noting that "[c]laims of ineffective assistance of counsel are not self-proving" and that (a) Petitioner's claims were "rambling, undeveloped, and conclusory" of "purported inequities" and failed to address the applicable standard; and (b) claim of ineffectiveness for failure to request an adverse inference that weapons evidence would have been unfavorable to the Commonwealth lacked arguable merit in light of the record as to the Commonwealth's conduct with regard to the evidence destruction and use of demonstrative evidence). Just so.

---

determinations related to this claim were objectively reasonable and Petitioner meets no entitlement to habeas relief.

[20] Id. at 11 n. 5 ("We note that our Supreme Court has determined that ineffectiveness claims are distinct issues under the PCRA to be reviewed under the three-prong ineffectiveness standard announced in Pierce.") (citing Commonwealth v. Collins, 888 A.2d 564, 573 (Pa. 2005)).

As noted above, the Commonwealth presented extensive evidence regarding its general procedures for destruction of long-retained evidence; the particular inclusion, in a routine destruction, of firearms confiscated at the time of Petitioner's crime but unused/unclaimed during his successful seven-year evasion of arrest by intra-state flight and the use of false personal identification; and the different firearm employed in the attempted homicides on which Petitioner was convicted and sentenced. In light of the trial evidence, Petitioner did not establish that his attorney's representation fell below an objective standard of reasonableness nor that any asserted deficiency in performance prejudiced the defense. The State Court's determinations were neither contrary to nor an unreasonable application of established federal law, nor an unreasonable determination of the facts.[21]

Petitioner's claim for habeas relief is, accordingly, without merit under the applicable standards. Cf. Superior Court's Opinion on PCRA Petition at 10-11 (recapping relevant facts, observing that *no* adverse inference arises under the record of this case, and therefore this claim of ineffectiveness of trial counsel lacks merit).[22]

---

[21] Petitioner's assertion that the Pierce standard is contrary to, or an unreasonable application of, the standard announced in Strickland, thus entitling him to habeas relief, is without merit as competently set forth in the Commonwealth's Answers at 55-58 (citing Harrington v. Richter, 131 S.Ct. 770 (2011) (noting that "question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard").

[22] Petitioner also suggests a claim on the basis of ineffectiveness of *appellate* counsel. See Traverse Reply/Mandamus at 17 ("For the sake of arguendo, Petitioner states that Trial and Appellate counsel were ineffective for failing to prosecute an Adverse Inference Request at trial and on Appeal; and that had the Adverse Inference been prosecuted at either stage, the results of the proceedings would have been different") (citing Strickland, 466 U.S. 687). Had Petitioner any such viable claim, it would lack merit for purposes of habeas relief for the same reasons as set forth above.

5. **Trial counsel was ineffective "for failing to request a jury instruction regarding other crime evidence"**

In this claim pertaining to the FBI Agent's testimony regarding the Agency's efforts to locate Petitioner, the possible cross-match by fingerprints to an individual going by another name in custody in Alabama, and Petitioner's ultimate return to Pennsylvania, Petitioner objects that the testimony was prejudicial and allowed the jury to infer that he had committed prior crimes and that his trial counsel was therefore ineffective in failing to request a jury instruction. As the Superior Court observed in addressing this claim related to evidentiary rulings, Petitioner's trial counsel objected to "the line of questioning concerning the FBI's efforts to locate Appellant as 'totally irrelevant to these proceedings'", to the Agent's testimony that a potential cross-matched individual was "in custody",[23] and to testimony that Petitioner was also on probation under another alias. Defense counsel's first two objections were overruled, but the trial court took note of his third, continuing objection and gave a concealment/flight charge to the jury (*i.e.*, the trial court specifically instructed the jury that flight or concealment may or may not be indicative of "consciousness of guilt", depending on the motives prompting it, and that they could not find the defendant guilty on that basis). See June 19, 2006 Superior Court Opinion on Direct Appeal at

---

Cf. generally Martinez v. Ryan, 132 S. Ct. 1309 (2012) (holding that habeas petitioner may establish cause for his default of an ineffective assistance of trial counsel claim by demonstrating that PCRA counsel rendered ineffective assistance). Until Martinez was decided, even cause for default could not be shown in this manner because – more relevant here - there is no constitutional right to counsel in PCRA proceedings, Pennsylvania v. Finley, 481 U.S. 551, 555 (1987), nor a constitutional right to the effective assistance of counsel in PCRA proceedings. Coleman, 501 U.S. at 752-53.

[23] The trial court had specifically instructed the Commonwealth to introduce testimony regarding how Petitioner was apprehended by using the terminology that the FBI was contacted by Alabama authorities regarding a man they had "in custody" without testimony that Petitioner was arrested for other crimes in Alabama. See July 15, 2005 Trial Court Opinion at 10-11.

16-19 (citing trial record); <u>cf.</u> July 15, 2005 Trial Court Opinion at 10-11 (stating that testimony of Agent was admitted as relevant to consciousness of guilt).

The Superior Court concluded, on Direct Appeal, that although the circumstances under which Petitioner was apprehended were "properly admitted as relevant to consciousness of guilt", (a) Pa. R.E. 404(b)(3) required a showing that the probative value of such evidence outweighed its potential for prejudice and, (b) although the trial court attempted to minimize potential prejudice, the explicit references to probation were "problematic under the reasoning of" <u>Commonwealth v. Santiago</u>, 822 A.2d 716 (Pa. Super. 2003) (finding testimony of parole officer of marginal value and outweighed) and <u>Commonwealth v. Matthews</u>, 783 A.2d 338 (Pa. Super. 2001) (prejudicial impact of learning defendant was on parole outweighed probative value).[24] The Superior Court went on to conclude, after careful review, that "the properly admitted and contradicted evidence of guilt was so overwhelming, and the prejudicial effect of the error so insignificant by comparison, that the error in permitting [the Agent] to twice refer to parole could not have contributed to the verdict." July 19, 2006 Superior Court Opinion on Direct Appeal at 24-25 (noting that all six police officers involved testified at trial, four identifying Petitioner as the shooter, the other two having remained with the driver of the car which Petitioner had commandeered in his initial attempt to flee until he was spotted and the car blocked by police vehicles; further noting that the defense presented no witnesses and asserted in closing, essentially, that the police were "setting up" Petitioner for "disrespecting" them). <u>See</u>

---

[24] <u>See also</u> Commonwealth's Answer at 61-62 & n. 15 (discussing cases). <u>Cf. id.</u> at 62-63 (noting that "[i]n some circumstances . . . counsel may reasonably conclude that it is strategically preferable to omit [a request for an "other crimes" instruction] since the instruction might have the undesired effect of highlighting the other crimes evidence") (quoting <u>Buehl v. Vaughn</u>, 166 F.3d163 (3d Cir. 1999) (and noting absence of record as to whether Petitioner's counsel made a strategic decision).

also Superior Court Opinion on PCRA Petition at 9-10 (concluding that claim of ineffectiveness of counsel for failing to request an "other crimes" instruction as to Agent's testimony did not merit relief where Petitioner failed to show a reasonable probability that, but for counsel's omission, result of proceeding would have been different) (citing Commonwealth v. Colavita, 993 A.2d 874, 887 (Pa. 2010); Commonwealth v. Page, 965 A.2d 1212, 1222 (Pa. Super. 2009)).

Based on the discussion above, Petitioner has not met his burden of showing that he is entitled to habeas corpus relief as to this claim. The record reflects no determination by the State Court that was contrary to or an objectively unreasonable application of clearly established Federal law, nor does it reflect any unreasonable determination of the facts in light of the evidence presented. To the contrary, the Superior Court's determination that any evidentiary error as to permit reference to Petitioner's parole was harmless under the circumstances of Petitioner's criminal proceedings and, *e.g.*, the "magnitude of the evidence against" Petitioner, was objectively reasonable. Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999 (discussing requirements of analysis under Strickland).

### 6. Actual innocence and/or miscarriage of justice

Petitioner's claim of actual innocence and a related miscarriage of justice is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993). As set forth in the preceeding thirty-five (35) pages, the undersigned has afforded Petitioner consideration of each of his claims on the merits. Had it not, Petitioner's claims would not remotely reach this gateway for reasons articulated above and in the Commonwealth's Answer at 46-48 (discussing Schlup v. Delo, 513 U.S. 298 (1995) (reiterating

that "[t]he meaning of actual innocence. . . [requires that given Petitioner's "new reliable evidence . . . that was not presented at trial"] no reasonable juror would have found the defendant guilty"); Cristin v. Brennan, 281 F.3d 414 (3d Cir. 2002); and related cases.

**D.      Certificate of Appealability**

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  As provided for in 28 U.S.C. § 2253, "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner has not made the requisite showing in these circumstances.  Accordingly, a certificate of appealability should be denied.

**III.     <u>CONCLUSION</u>**

For the reasons set forth above, it is respectfully recommended that the Petition for Writ of Habeas Corpus (ECF No. 1) be denied and that a certificate of appealability also be denied.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated: August 1, 2013

Lisa Pupo Lenihan
Chief United States Magistrate Judge

Cc:    Counsel of Record

      Ernest Woodall
      AP-9353
      SCI-Dallas
      1000 Follies Rd.
      Dallas, PA  18612